UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

LEGENDS ARE FOREVER, INC.,

                                    Plaintiff,

            -against-                                3:12-CV-1495 (LEK/DEP)

NIKE, INC.,

                                    Defendant.
_____

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

        Plaintiff Legends are Forever, Inc. ("Plaintiff" or "LAF"), commenced this trademark suit

against Defendant Nike, Inc. ("Defendant" or "NIKE"), on September 27, 2012.  Dkt. No. 1

("Complaint").  Presently before the Court is Defendant's Motion for summary judgment.  Dkt No.

30 ("Motion").  For the following reasons, the Motion is granted.

## II.   FACTS[1]

### A.  Plaintiff's Business

        Plaintiff is a baseball-themed souvenir shop located in Cooperstown, NY.  Dkt. No. 32

("Statement of Material Facts" or "SMF") ¶ 1.  Cooperstown is the home of the National Baseball

Hall of Fame, and is therefore a tourist destination.  Id. ¶ 2.  Plaintiff's storefront sign prominently

advertises Major League Baseball apparel, souvenirs related to Cooperstown, and autographed

baseball memorabilia.  Id. ¶ 3.

        LAF's owner and president is Jeffrey Foster ("Jeff Foster"), who founded the store in 2001

_____

[1] Plaintiff did not respond to Defendant's Statement of Material Facts.  See Docket.
Accordingly, pursuant to Local Rule 7.1(a)(3), the facts set forth in Defendant's Statement of
Material Facts are deemed admitted and form the basis of this section.

after owning another baseball-related retail business in Cooperstown.  <u>Id.</u> ¶¶ 4-6.  Plaintiff's business is roughly 95% baseball-related products and autographed memorabilia.  <u>Id.</u> ¶ 11.  Plaintiff previously sold its products through a website, which it shut down in September 2012.  <u>Id.</u> ¶¶ 12-13.

Jeff Foster came up with the phrase "Legends Are Forever" to evoke the feelings and emotions surrounding baseball history.  <u>Id.</u> ¶¶ 19-21.  In 2007, Plaintiff applied to register the mark "LEGENDS ARE FOREVER."  <u>Id.</u> ¶ 24.  This application was abandoned and revived twice—in December 2008 and June 2009—before registration number 3,731,889 was issued in December 2009 (the "Asserted Mark").  <u>Id.</u>  Plaintiff has not used a registered trademark symbol on any of its products bearing the Asserted Mark, and there is no set style used by Plaintiff for displaying the Asserted Mark.  <u>Id.</u> ¶¶ 25-26.

Plaintiff's typical customer is a visitor to Cooperstown who wants a souvenir or memento of their trip.  <u>Id.</u> ¶ 37.  Most of these visitors also visit the Baseball Hall of Fame.  <u>Id.</u>  Plaintiff does not currently do any advertising.  <u>Id.</u> ¶ 39.  Plaintiff previously had former baseball players visit the store to sign autographs, but otherwise confined its marketing activities to local advertisements and Facebook postings.  <u>Id.</u> ¶¶ 39-40.  Plaintiff also paid "pay-per-click" fees with various internet search engines and shopping sites.  <u>Id.</u> ¶ 41.  Plaintiff would list its memorabilia and merchandise on various shopping websites and pay a fee each time a prospective customer clicked on a product listing.  <u>Id.</u>

Plaintiff's business has been declining in recent years, and it recently downsized to a smaller space.  <u>Id.</u> ¶ 48.  As a result, Plaintiff may attempt to sell more apparel in place of autographed baseball memorabilia, but has not taken any active steps to do so.  <u>Id.</u>

**B. Defendant's Business**

Defendant is the largest seller of athletic footwear and apparel in the world. <u>Id.</u> ¶ 51. Its principal business is the design, development, and worldwide marketing and sale of athletic footwear, equipment, accessories, and services. <u>Id.</u> Defendant's NIKE mark and NIKE swoosh logo have been recognized as "famous" under the Lanham Act, 15 U.S.C. § 1125(c). <u>Id.</u> ¶ 52 (citing <u>NIKE, Inc. v. Top Brand Co.</u>, No. 00-CV-8179, 2004 WL 165859, at *9 (S.D.N.Y. July 13, 2005) and <u>NIKE, Inc. v. Variety Wholesalers, Inc.</u>, 274 F. Supp. 2d 1352, 1372 (S.D. Ga. 2003)). Defendant sells its products through its own retail stores and internet websites, and through a mix of independent distributors and licensees.

**C. Kobe Bryant: Black Mamba**

In January 2011, Defendant aired a six-minute film titled "The Black Mamba." SMF ¶ 54. The film starred professional basketball player Kobe Bryant ("Kobe"), and was part of a promotional campaign surrounding Defendant's release of a Kobe-themed shoe. <u>Id.</u> ¶¶ 54, 56. The film concludes with Kobe questioning the film's director—Robert Rodriguez—"So how should it end?" <u>Id.</u> ¶ 58. Rodriguez responds, "Black Mamba doesn't end. Heroes come and go . . . ," and Kobe interrupts and completes the sentence, "but legends are forever." <u>Id.</u>

After seeing the film in November 2011, Jeff Foster approached Defendant on behalf of Plaintiff to see if Defendant was interested in paying for use of the phrase "legends are forever." <u>Id.</u> ¶¶ 59, 61. Matthew Foster ("Matt Foster"), Jeff's brother and an employee of Plaintiff from 2009 until 2013, also contacted Defendant regarding the possible lease or sale of the Asserted Mark. <u>Id.</u> ¶¶ 7, 62. Defendant did not pursue these offers. <u>Id.</u> ¶ 63.

**D. The Shirt**

In April 2011, Defendant designed apparel for its Kobe Bryant summer product line. Id. ¶ 65. The phrase "legends are forever" was initially propsed for a t-shirt in the line, and preliminary designs, graphics, and ten "salesman samples" of a t-shirt with the phrase were created. Id. The ten salesman samples were not intended for sale and were never sold or offered for sale by Defendant. Id.

Defendant rejected the phrase "legends are forever" prior to production and sale of the t-shrts in the Kobe Bryant line, and instead selected the phrase "legends live forever" for t-shirt style No. 465630 (the "Black Mamba Shirt"). Id. ¶ 66. Although the phrase "legends are forever" was never used on any product sold or offered for sale by Defendant, the proposed phrase was inadvertently retained in Defendant's internal database. Id. ¶ 68. The retention of this language may account for any use of the phrase "legends are forever" in internet descriptions of the "legends live forever" Black Mamba Shirt. Id.

According to Matt Foster, in June 2012, a customer walked into Plaintiff's store wearing a shirt that said either "legends are forever" or "legends live forever." Id. ¶ 70. Matt Foster asked the customer about the shirt, and the customer explained that it was a Black Mamba shirt and identified it as a Kobe Bryant item. Id. ¶¶ 70-71.

At some point, Jeff Foster obtained a NIKE-produced t-shirt with the phrase "legends are forever" printed on it (the "Accused Shirt"). Id. ¶ 73. He obtained the Accused Shirt from an individual seller through ebay.com, an online auction site. Id. ¶ 73. The Accused Shirt lacked a price tag and included a white tag stating: "This is a sample." Id. The Fosters attempted to purchase additional NIKE shirts with this phrase but were unable to find any. Id. ¶ 79.

The Fosters were able to buy Black Mamba Shirts—i.e., those with the phrase "Legends Live Forever." Id. ¶ 80. Plaintiff contends that online retailers selling these shirts described them with the style name "Legends Are Forever Kobe Bryant Shirt," and may have included graphics from the allegedly infringing shirt. Id. ¶ 82.

### E. Procedural History

Plaintiff commenced this action on September 27, 2012, asserting claims of: (1) federal trademark infringement under 15 U.S.C. § 1114; (2) common law trademark infringement and unfair competition; (3) federal unfair competition and false designation of origin under 15 U.S.C. § 1125; (4) federal trademark dilution under 15 U.S.C. § 1125; and (5) violation of New York General Business Law § 349. Compl. ¶¶ 19-60. Plaintiff seeks declaratory and monetary relief. Id.

Discovery in this case progressed "at a disturbingly slow pace," Dkt. No. 38 ("Fees Order") at 2, culminating in an Order by the Honorable David E. Peebles, U.S. Magistrate Judge, directing Plaintiff to pay Defendant $12,332.82 in attorney's fees, id. at 16. Defendant filed its Motion for summary judgment on November 1, 2013, Mot.; Dkt. No. 31 ("Memorandum"), but the disposition of the Motion was delayed by Plaintiff's erroneous appeal of the Fees Order to the Second Circuit, June 3, 2014 Text Order; Dkt. Nos. 41 ("Appeal"); 50. The Appeal was stricken and withdrawn in June 2014. June 3, 2014 Text Order; Dkt. No. 50.

Plaintiff Responded to Defendant's Motion, but, as noted *supra*, Plaintiff failed to respond to Defendant's Statement of Material Facts. Dkt. No. 37 ("Response"). Defendant filed a Reply. Dkt. No. 39 ("Reply").

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) instructs a court to grant summary judgment if "there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the non-moving party will bear the burden of proof on a specific issue at trial, the moving party may satisfy its own initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. Id. If the moving party carries its initial burden, then the non-moving party bears the burden of demonstrating a genuine issue of material fact. Id. This requires the nonmoving party to do "more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). A court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

**IV.    DISCUSSION**

**A.  Federal Trademark Infringement and Unfair Competition Claims**

Plaintiff asserts a claim of trademark infringement under 15 U.S.C. § 1114, and a claim of unfair competition under 15 U.S.C. § 1125.  Compl. ¶¶ 19-27, 35-42.  Claims under both these sections are analyzed under a familiar two-pronged test: (1) whether the mark is valid and "entitled to protection"; and (2) whether there is a likelihood of consumer confusion as to origin or sponsorship of the defendant's services.  See Virgin Enters. Ltd. v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003).

Defendant argues that even if the mark is protectable and therefore satisfies the first prong, Plaintiff cannot prove a likelihood of confusion.  Mem. at 7.

In analyzing the second prong of the test for trademark infringement, courts apply the non-exclusive multi-factor test developed in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961), and consider: (1) the strength of the mark, (2) the similarity of the two marks, (3) the proximity of the products, (4) actual confusion, (5) the likelihood of plaintiff's bridging the gap, (6) defendant's good faith in adopting the mark, (7) the quality of defendant's products, and (8) the sophistication of the consumers.  Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 116 (2d Cir. 2006).[2]

*1.  Strength of the Mark*

The first Polaroid factor measures a mark's "tendency to identify the goods [or services] sold under the mark as emanating from a particular . . . source."  The Sports Auth., Inc. v. Prime

---

[2] Notably, despite Defendant's analysis of each Polaroid factor in its Memorandum, Plaintiff failed to discuss—or even cite—the Polaroid factors in its Response.  Mem. at 8-21; Resp.

Hospitality Corp., 89 F.3d 955, 960 (2d Cir. 1996). When determining a mark's strength, courts consider both the mark's inherent distinctiveness, based on the characteristics of the mark itself, and its acquired distinctiveness, based on associations the mark has gained through use in commerce. See Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 743-44 (2d Cir. 1998). Inherent distinctiveness "examines a mark's theoretical potential to identify plaintiff's goods or services without regard to whether it has actually done so." Brennan's, Inc. v. Brennan's Rest., L.L.C., 360 F.3d 125, 131 (2d Cir. 2004). Acquired distinctiveness measures the "recognition plaintiff's mark has earned in the marketplace as a designator of plaintiff's goods or services." Id.

Courts classify a mark in one of four categories in increasing order of inherent distinctiveness: generic, descriptive, suggestive, and arbitrary. Streetwise Maps, 159 F.3d at 744 (citing Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir. 1976)). "A generic term is a common name, like automobile or aspirin, that describes a kind of product." Gruner Jahr USA Pub. v. Meredith Corp., 991 F.2d 1072, 1075 (2d Cir. 1993). Such terms are not entitled to trademark protection. Id. Arbitrary marks, such as "Ivory" for soap, lie at the opposite end of the spectrum. Id. at 1075-76. They are not common names for a product, and are always entitled to trademark protection. Id.

"A suggestive mark . . . suggests the product, though it may take imagination to grasp the nature of the product." Id. at 1076. For example, the name "Orange Crush" suggests an orange-flavored beverage. Id. A descriptive mark "tells something about a product, its qualities, ingredients or characteristics." Id.

The Asserted Mark is, at most, a suggestive mark, as it evokes the nostalgia for baseball history, and Plaintiff sells baseball memorabilia. "In the absence of any showing of secondary

8

meaning, suggestive marks are at best moderately strong." Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 385 (2d Cir. 2005). "Secondary meaning attaches when the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business." Time, Inc. v. Petersen Publ'g Co. L.L.C., 173 F.3d 113, 117 (2d Cir. 1999) (internal quotation marks omitted).

Courts within the Second Circuit look at six factors to establish whether a mark has acquired secondary meaning: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." Marshall v. Marshall, No. 08-CV-1420, 2012 WL 1079550, at *16 (E.D.N.Y. Mar. 30, 2012). However, "[n]o precise guidelines are applicable and no single factor is determinative," Murphy v. Provident Mut. Life Ins. Co. of Philadelphia, 923 F.2d 923, 928 (2d Cir. 1990) (internal quotation marks omitted), and the Second Circuit has emphasized that "the fundamental question . . . is whether 'the primary significance of the term in the minds of the consuming public is not the product but the producer,'" Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1041 (2d Cir. 1992) (quoting Centaur Commc'ns, Ltd. v. A/S/M/ Commc'n, Inc., 830 F.2d 1217, 1221 (2d Cir. 1987)). Whether a mark has acquired secondary meaning is a "factual determination, proof of which entails vigorous evidentiary requirements," Marshall, 2012 WL 1079550, at *16 (internal quotation marks omitted), and the burden of proof rests on the "party asserting rights in the mark," Hi-Tech Pharmacal Co. v. Hi-Tech Pharms., Inc., No. 05-CV-2674, 2007 WL 1988737, at *10 (E.D.N.Y. July 5, 2007).

Here, Plaintiff has produced no evidence, or even argument, to show that its Asserted Mark has acquired secondary meaning. Accordingly, Plaintiff's Asserted Mark lacks secondary meaning

9

and is a relatively weak suggestive mark.

### 2. Similarity

"The similarity of the marks is a key factor in determining likelihood of confusion." <u>Louis Vuitton Malletier</u>, 454 F.3d at 117. "To apply this factor, courts must analyze the mark's overall impression on a consumer, considering the context in which the marks are displayed and 'the totality of factors that could cause confusion among prospective purchasers.'" <u>Malletier v. Burlington Coat Factory Warehouse Corp.</u>, 426 F.3d 532, 537 (2d Cir. 2005) (quoting <u>Meredith Corp.</u>, 991 F.2d at 1078). "[T]he Lanham Act requires a court to analyze the similarity of the products in light of the way in which the marks are actually displayed in their purchasing context." <u>Malletier</u>, 426 F.3d at 538. "Courts should keep in mind that in this context the law requires only confusing similarity, not identity." <u>Louis Vuitton</u>, 454 F.3d at 117.

Here, the only similarities between Plaintiff's baseball shirts and the sample shirt produced by Defendant are: (1) they are both t-shirts, and (2) they both incorporate the phrase "legends are forever." The style of the graphics on the shirts are entirely different in terms of design, color, typeface, and theme. <u>See</u> SMF. Additionally, the NIKE swoosh is prominently displayed on the allegedly infringing shirt, clearly identifying it with Defendant's business, not Plaintiff's. <u>Id.</u> The Accused Shirt is therefore only similar to Plaintiff's products in a superficial sense.

### 3. Proximity Between the Parties' Goods

The proximity factor considers whether the two goods compete with each other. <u>The Sports Auth.</u>, 89 F.3d at 963. "When the two users of a mark are operating in completely different areas of commerce, consumers are less likely to assume that their similarly branded products come from the same source." <u>Virgin Enters. Ltd.</u>, 335 F.3d at 150. "In contrast, the closer the secondary user's

goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source." Id. "[D]irect competition between the products is not a prerequisite to relief." Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 396 (2d Cir. 1995).

"The competitive proximity factor has two elements, market proximity and geographic proximity." Brennan's, 360 F.3d at 134. "Market proximity asks whether the two products are in related areas of commerce and geographic proximity looks to the geographic separation of the products." Id. "Both elements seek to determine whether the two products have an overlapping client base that creates a potential for confusion." Id.

Here, the parties both sell sports-themed t-shirts, but Defendant is a multi-national company that sells a range of products worldwide, while Plaintiff is a baseball memorabilia shop that sells its goods out of a storefront in Cooperstown, NY. To the extent there is any overlap in their client bases such that confusion might arise, it appears to be marginal. Accordingly, this factor weighs in favor of Defendant.

### 4. *"Bridging the Gap"*

When two retailers do not directly compete in the same market, the "bridge the gap" factor considers the likelihood that the plaintiff would enter the defendant's market. See Sports Auth., 89 F.3d at 963. Here, there is no evidence that Plaintiff will expand its business to include celebrity-themed basketball shoes and apparel like the Kobe Bryant line at issue, nor is there evidence that Plaintiff is seeking to grow its business to compete for Defendant's large consumer base. This factor therefore weighs in favor of Defendant.

*5. Actual Confusion*

"For purposes of the Lanham Act, actual confusion means consumer confusion that enables a seller to pass off his goods as the goods of another." Sports Auth., 89 F.3d at 963 (internal quotation marks omitted). Evidence of actual confusion is a strong indication that a likelihood of confusion exists. However, since actual confusion is difficult to prove, it is well-established that actual confusion need not be shown to prove likelihood of confusion under the Lanham Act. Coach Leatherware Co. v. AnnTaylor, Inc., 933 F.2d 162, 170-71 (2d Cir. 1991) "Courts can properly take into account evidence of 'either a diversion of sales, damage to goodwill, or loss of control over reputation.'" Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C., 182 F.3d 133, 141 (2d Cir. 1999) (quoting Sports Auth., 89 F.3d at 963).

"Typically, an infringement plaintiff undertakes to prove actual confusion between its products and the defendant's in two ways: anecdotal evidence of particular incidents and market research surveys." Home Shopping Club, Inc. v. Charles of the Ritz Grp., Inc., 820 F. Supp. 763, 774 (S.D.N.Y. 1993). Here, Plaintiff offers neither. Instead, Plaintiff offers only the anecdote that one customer entered its store wearing a shirt that said either "legends are forever" or "legends live forvever," and informed Matt Foster that it was a Kobe Bryant shirt. SMF ¶ 70. If anything, the exchange demonstrates the customer's lack of confusion. See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 269 F.3d 114, 124 (2d Cir. 2001) (stating that inquiries about the relationship between an owner of a mark and an alleged infringer are "arguably premised upon a *lack* of confusion between the products such as to inspire the inquiry itself"). This factor therefore weighs in favor of Defendant.

### 6. Defendant's Good Faith

This factor concerns "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill, and any confusion between his and the senior user's product." Lang v. Ret. Living Pub. Co., 949 F.2d 576, 583 (2d Cir. 1991). Here, Plaintiff has produced no evidence that Defendant intended to capitalize off Plaintiff's reputation. Indeed, it is inconceivable that a rational factfinder could conclude that NIKE designed a Kobe Bryant-sponsored t-shirt in order to sow confusion between its product and that of a baseball memorabilia store in Cooperstown, NY. Accordingly, this factor weighs in favor of Defendant.

### 7. Quality of Services

"This factor is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." Arrow Fastener Co., 59 F.3d at 398. The concern is "not so much with the likelihood of confusion as with the likelihood of harm resulting from any such confusion." MGM-Pathe Commc'ns Co. v. Pink Panther Patrol, 774 F. Supp. 869, 876 (S.D.N.Y. 1991); see also Virgin Enters. Ltd., 335 F.3d at 152.

Defendant's products are famous and sold worldwide. SMF ¶¶ 51-53. Plaintiff has presented no evidence to show that its own t-shirts are of higher quality than those sold by Defendant. Accordingly, this factor weighs in favor of Defendant.

### 8. Sophistication of Customers

A high degree of consumer sophistication decreases the risk of consumer confusion. Morningside Grp. Ltd., 182 F.3d at 142. "[The] analysis of consumer sophistication 'consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the

13

market and giving the attention such purchasers usually give in buying that class of goods.'" <u>Star Indus.</u>, 412 F.3d at 390 (quoting <u>Sports Auth.</u>, 89 F.3d at 965). "The level of sophistication, or lack thereof, can be proven either by direct evidence, such as with a survey or expert opinion, or the Court may rely on indirect indications of sophistication established by the nature of the product or its price." <u>24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC</u>, 447 F. Supp. 2d 266, 286 (S.D.N.Y. 2006) (internal quotation marks and citations omitted).

Plaintiff has not presented any evidence to show that its customers are so unsophisticated that they would confuse one of Defendant's shirts with one of Plaintiff's. On the contrary, Plaintiff indicates that its customers are primarily baseball fans, and in the one anecdotal case of a customer wearing one of Defendant's t-shirts in Plaintiff's store, the customer appeared well aware of the distinction between the two. This factor therefore weighs in favor of Defendant.

### 9. Totality of the Polaroid Factors

Nearly all of the factors weigh heavily in favor of Defendant, and none weigh heavily in favor of Plaintiff. Accordingly, no likelihood of confusion exists, and Defendant is entitled to summary judgment on Plaintiff's federal trademark infringement and unfair competition claims.

### B. State Common Law Claims

"The elements necessary to prevail on causes of action for trademark infringement and unfair competition under New York common law mirror" analogous federal claims. <u>ESPN, Inc. v. Quiksilver, Inc.</u>, 586 F. Supp. 2d 219, 230 (S.D.N.Y. 2008). Accordingly, because Plaintiff's federal trademark infringement and unfair competition claims fail as a matter of law, Defendant is entitled to summary judgment on the analogous state law claims, as well.

14

### C. Trademark Dilution Claim

"A threshold question in a federal dilution claim is whether the mark at issue is 'famous.'" Coach Servs., Inc. v. Triumph Learning LLC, 668 F.3d 1356, 1372 (Fed. Cir. 2012). A mark is famous if it "is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). Nothing in the record suggests that Plaintiff's Asserted Mark meets this exceedingly high standard. Accordingly, Defendant is entitled to summary judgment on Plaintiff's federal trademark dilution claim.

### D. New York General Business Law § 349 Claim

New York General Business Law § 349(a) bars "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York. "While competing businesses have standing to sue under this provision, it is, 'at its core, a consumer protection device,' and thus 'the gravamen of the complaint must be consumer injury or harm to the public interest,' not mere competitive disadvantage." Mobileye, Inc. v. Picitup Corp., 928 F. Supp. 2d 759, 783 (S.D.N.Y. 2013) (quoting Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995)). Accordingly, "it is well-established that trademark infringement actions alleging only general consumer confusion do not threaten direct harm to consumers for purposes of stating a claim under section 349." Luv N' Care, Ltd. v. Walgreen, Co., 695 F. Supp. 2d 125, 136 (S.D.N.Y. 2010) (alteration and internal quotation marks omitted). Rather, "for the statute to apply, a plaintiff must establish a direct harm to consumers that is greater than the general consumer confusion commonly found in trademark actions, such as potential danger to the public health or safety." Eliya, Inc. v. Kohl's Dept. Stores, 82 U.S.P.Q.2d 1088, 1096 (S.D.N.Y. 2006) (alteration and

internal quotations omitted).

Here, Plaintiff's claim fails as a matter of law both because of the lack of evidence to support its infringement claims, and because of Plaintiff's failure to even allege an additional direct harm to the public interest. <u>See</u> Compl. Accordingly, Defendant is entitled to summary judgment on this claim, as well.

### E. Federal Rule of Civil Procedure 56(d)

In its Response to Defendant's Motion, Plaintiff cites Federal Rule of Civil Procedure 56(d) and requests that the Court allow additional time for Plaintiff to obtain discovery. Resp.

Under Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." FED. R. CIV. P. 56(d). The Second Circuit has held that a party invoking Rule 56(d) must file an affidavit that demonstrates:

> (1) the nature of the uncompleted discovery, i.e., what facts are sought and how they are to be obtained; and

> (2) how those facts are reasonably expected to create a genuine issue of material fact; and

> (3) what efforts the affiant has made to obtain those facts; and

> (4) why those efforts were unsuccessful.

<u>Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.</u>, 769 F.2d 919, 926 (2d Cir. 1985). Even when a Rule 56(d) motion satisfies these requirements, a district court may refuse a party's request for additional discovery if the party has "had ample time in which to pursue the discovery that it now claims is essential." <u>Id.</u> at 927; <u>see also</u> <u>Trebor Sportswear Co. v. The Limited Stores,</u>

Inc., 865 F.2d 506, 511 (2d Cir. 1989) (denying request for additional discovery when the party opposing summary judgment had a "fully adequate opportunity for discovery").

Here, Plaintiff states that it failed to obtain an expert report due to financial difficulties imposed by other litigation.  Resp. at 1; Dkt. No. 36-1.  However, Plaintiff's lack of diligence in conducting discovery in this case is well documented in the record.  See, e.g., Fees Order; Dkt. Nos. 15; 45.  Furthermore, the litigation that allegedly prevented Plaintiff from hiring an expert arose in 2012, meaning that Plaintiff could have requested an extension of the discovery deadline in this case.  See Dkt. No. 36-1 ¶¶ 23-26.  Plaintiff did not do so.  See Docket.  Accordingly, because Plaintiff failed to take advantage of the ample opportunity afforded it to obtain an expert report, the Court rejects its Rule 56(d) request.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendant's Motion (Dkt. No. 30) for summary judgment is **GRANTED**; and it is further

**ORDERED**, that the Clerk of the Court enter judgment for Defendant and close this case; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:     September 30, 2014
           Albany, NY

Lawrence E. Kahn
U.S. District Judge

17